```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA            ) Case No. 25 CR 636 -
                                         ) 1 and 2
 4              vs.                       )
                                         )
 5   MARIMAR MARTINEZ and ANTHONY IAN SANTOS )
     RUIZ,                               ) Chicago, Illinois
 6                                       ) October 6, 2025
                Defendants.              ) 2:22 P.M.
 7
              TRANSCRIPT OF PROCEEDINGS - DETENTION HEARING
 8     BEFORE THE HONORABLE HEATHER K. McSHAIN, MAGISTRATE JUDGE

 9   APPEARANCES:

10   For the Government:       HONORABLE ANDREW S. BOUTROS
                               UNITED STATES ATTORNEY
11                             BY:  MR. SEAN HENNESSY
                               Assistant United States Attorney
12                             219 South Dearborn Street, 5th Floor
                               Chicago, Illinois 60604
13
     For Defendant Martinez:   CHERONIS & PARENTE
14                             BY:  MR. CHRISTOPHER PARENTE
                               140 S. Dearborn Street, Suite 404
15                             Chicago, Illinois 60604

16   For Defendant Ruiz:       FEDERAL DEFENDER PROGRAM
                               BY:  MR. BENJAMIN HORWITZ
17                             55 E. Monroe Street, Suite 2800
                               Chicago, Illinois  60603
18
     Also Present:             MS. CHRISTA GREEN
19                             Pretrial Service Officer

20   ** NOTE:  FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
          RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED**
21
     Court Reporter:           PAMELA S. WARREN, CSR, RPR
22                             Official Court Reporter - Retired
                               23869 N. High Ridge Drive
23                             Lake Zurich, Illinois 60047
                               312.823.0001 - pswcsr@gmail.com
24
                              * * * * *
25        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1    (Proceedings held in open court:)

2         THE CLERK:  This court is back in session.  Case

3    Number 25 CR 636, USA v. Miramar Martinez and Anthony Ian

4    Santos Ruiz for detention hearing.

5         THE COURT:  Good afternoon.  Counsel, please state

6    your appearance for the record, beginning with the government.

7         MR. HENNESSY:  Good afternoon, your Honor.  Sean

8    Hennessy on behalf of the United States.

9         THE COURT:  Thank you.  Sorry, give me one minute.  I

10   am checking a document.

11        On behalf of Ms. Martinez, please.

12        MR. PARENTE:  Good afternoon, your Honor.  Chris

13   Parente for Ms. Martinez.

14        THE COURT:  Thank you.

15        And on behalf of defendant Santos Ruiz.

16        MR. HORWITZ:  Good afternoon, Judge.  Ben Horwitz of

17   the Federal Defender Program on behalf of Mr. Ruiz.  I just

18   want to let the Court know, he goes by Ruiz.

19        THE COURT:  Thank you for confirming that.

20        I will also note that both defendants are in the

21   courtroom.

22        And for pretrial services, please.

23        MS. GREEN:  Christa Green from pretrial services.

24        THE COURT:  Thank you.

25        I'll note that while I have been on the bench, I

1    received two emails from Sean Smitherman (phonetic) from

2    pretrial services with sort of a download of pretrial

3    services's position with respect to both of these defendants.

4            Mr. Parente, did you receive that email?

5            MR. PARENTE:  I did, your Honor, and I reviewed it.

6    Thank you.

7            THE COURT:  Thank you.

8            Mr. Horwitz, did you receive that?  Probably not since

9    you were in court at the same time.

10           MR. HORWITZ:  I can check right now, Judge.

11           THE COURT:  Thank you.

12           Mr. Hennessy, did you receive those emails?

13           MR. HENNESSY:  Yes, your Honor.

14           THE COURT:  Thank you.

15       (Brief pause.)

16           MR. HORWITZ:  Thank you, Judge.

17           THE COURT:  Okay.  Mr. Horwitz, thank you for

18    confirming that.

19           So we're here on the government's motion to detain.

20    I'll just note -- and Officer Green, just for the benefit of

21    the record, having read the two emails provided by pretrial

22    services, pretrial services, as I understand it, is

23    recommending release with respect to both of these defendants

24    subject to conditions that are memorialized in those emails.

25           From pretrial services's position, anything else you

1    would like to put on the record regarding pretrial services's

2    position?

3          MS. GREEN:  No, your Honor.

4          THE COURT:  Thank you, Officer Green.

5          So the burden here is on the government with respect

6    to this detention motion.  My intention is to have Mr. Hennessy

7    argue first.  I will then hear -- and I would like you to argue

8    the motion with respect to both defendants at the same time for

9    efficiency.

10          I will then hear from defense counsel.

11          And then I will give the government last words since

12    you have the burden here.  Okay?

13          Mr. Hennessy, you are free to proceed.

14          MR. HENNESSY:  Thank you, your Honor.  The

15    government's position is that both defendants should be

16    detained as dangers to the community.

17          Turning to the 3142(g) factors, your Honor, I'm going

18    to focus my presentation on the nature and circumstances of the

19    offense because it was dangerous and it was extremely serious.

20          I want to start at the end.  The end of this sequence

21    of events involves the defendants driving their vehicles into a

22    CBP-owned vehicle, one on the driver's side and one on the rear

23    passenger's side.

24          With respect to Ms. Martinez, after the CBP vehicle

25    comes to a stop and the agents -- three agents within the car

step out, Ms. Martinez drives towards one of them.

Your Honor, this end of a sequence of events that I will get back to in a second was extremely dangerous. It was dangerous to the agents, it was dangerous to the defendants. They endangered one another in performing this conduct. And they also put in danger anybody who was on the street, either other motorists or people walking around who are at the wrong place at the wrong time. It is extremely reckless, and it is extremely dangerous.

Your Honor, that zenith only happens after a sequence of events that involves the CBP vehicle being followed by a number of cars from Oak Lawn north into Chicago.

Within those cars that were following the CBP vehicle, were the cars driven by Ms. Martinez and Mr. Ruiz.

And according to the agents in the car, Ms. Martinez was following for roughly 30 minutes and Mr. Ruiz was following for roughly 20 minutes. I raise those times because I think it is evidence that -- that this was intentional. The defendants were not in the wrong place at the wrong time. They weren't there by mistake. And it also wasn't a spur-of-the-moment decision.

Each defendant had opportunity after opportunity to turn off, get off the roadway, stop following this car. They chose again and again not to. And I think it's -- I think it shows the intent to interfere, impede, harass, assault the

federal agents in the car.

Your Honor, sticking with intent -- and this argument is specific to Ms. Martinez.  Ms. Martinez broadcasted her following of the CBP vehicle on Facebook Live for at least two and a half minutes.  The broadcast shows Ms. Martinez following the car through a residential neighborhood.  It captured her laying on the horn, yelling loudly out the window, and following the car.  I raise this again because I think this is additional evidence of intent to be exactly where she found herself.

Your Honor, again, with respect to Ms. Martinez specifically, this entire sequence of events happened while Ms. Martinez had a loaded firearm in her car.

After -- after the sequence of events and after Ms. Martinez's car is recovered by law enforcement, law enforcement found a loaded handgun in an open purse in the passenger's front seat of Ms. Martinez's car.  That gun introduced additional volatility to what was already clearly a volatile environment.  And I think it -- it exemplifies the dangerousness of Ms. Martinez's conduct.

With respect to Mr. Ruiz specifically, after -- after the defendants's cars struck the CBP vehicle, Mr. Ruiz peeled out, backing up, smashes into another car parked on the side of the street, and then does a u-turn and turns around.

I raise the hitting of this other car because, again,

I think it shows -- it shows a lack of judgment and a
dangerousness of conduct that the Court should be aware of.

And so your Honor, just to recap, both defendants
involved themselves in what everyone in this courtroom knows
was going to be a volatile situation.  They intentionally
escalated the volatility of that situation by inserting
themselves.  It made it dangerous for them.  It made it
dangerous for the agents.  And it made it dangerous for anybody
out on the street, the public, who happened to be in the wrong
place at the wrong time.

And your Honor, Ms. Martinez did all of this with a
loaded firearm within arm's reach.

Thank you.

THE COURT:  Mr. Hennessy, I have a couple of
questions.  There is an allegation that Ms. Martinez brandished
or utilized that firearm, correct?

MR. HENNESSY:  No, your Honor.

THE COURT:  Did she lawfully possess the firearm?

MR. HENNESSY:  My -- I do not have that -- this is a
double negative.  I do not have evidence that she unlawfully
possessed it, your Honor.

THE COURT:  With respect to Mr. -- the point made
about Mr. Ruiz's car, that after hitting the agents's car he
then backed into an uninvolved parked car, but he also then --
what happened next according to the affidavit?

1       MR. HENNESSY:  Your Honor, my understanding, based on

2   the agents's rendition of events and corroborated by certain

3   BWC, is that Mr. Ruiz took his car about half a block south and

4   he parked at a gas station.

5       According to the agents, he was gesticulating at them,

6   yelling at them, doing hand signals, but he did stay in the

7   area.

8       THE COURT:  Those are in the nature and circumstances

9   of the offense.  It is the least weighty factor under Seventh

10  Circuit case law for the 3142(g) factors.  And the Act does

11  require the Court under the -- under all of these factors to

12  consider not only the nature and circumstances of the offense

13  and all these other factors, which the government has not

14  raised or discussed, but separate and apart from that, it is

15  not just if one of these factors applies, right?  The burden on

16  the government here is not only to meet its burden of proof but

17  also there are factors that pretrial has thoughtfully proposed

18  here.

19      Why are those insufficient?  Why do those not mitigate

20  the dangers to community here?

21      MR. HENNESSY:  Your Honor, I agree with you.  It does

22  appear that there is mitigating circumstances in both of their

23  backgrounds.

24      If I caught the pretrial reports accurately, they are

25  both lifelong residents of the district.  And it sounds like

they both have family homes that they can return to.

I don't think that the mitigating factors in their background adequately combat the seriousness of this offense. There has been a lot of events evolved -- involving these operations that are ongoing in Chicago. I think it is fair to say that this is certainly one of the more serious ones.

They -- these two defendants took their vehicles and intentionally struck a CBP-operated vehicle while it was conducting its official duties. And I think the seriousness of that outweighs the mitigating factors.

THE COURT: Mr. Parente.

MR. PARENTE: Yeah, I mean, I'll echo what the Court just said. I think that falls woefully short of the burden on the government to detain Ms. Martinez. But I'm going to go through the 4142(g) (sic) factors for your Honor so it is even more clear that, of course, there are conditions that can be set that can release a 30-year-old Chicago lifelong U.S. Citizen woman with no criminal history so that she's not considered a danger to the community.

I'll start as well with the nature and circumstances of the offense. Judge, I heard you in the last hearing. These are very serious offenses. We get that. But for this case specifically, the facts are in dispute. What you are hearing from the government -- and the government is not batting anywhere near a thousand in accuracy on their description of

these kinds of cases in this district.  It is not correct what they have said.

I have watched the video.  I thought the government might show it to you.  I have it with me.  I will show it to you if your Honor wants to see it.  It is scary.  There is a danger to the community, but it is not Mrs. Martinez, it is the fact that we have three -- I'm presuming they are from out of town because when they pronounced 39th and Kedzie, they pronounce it Kedeezee (phonetic).

But they are in full military fatigues carrying assault rifles driving a vehicle with an Uber logo on the front that glows.  And moments before this happens, one of the agents says, at least according to my ability to listen, do something, bitch while he's -- his hands are on an assault rifle in the back of this car driving through a Chicago neighborhood.

I mean, what is going on?  Who -- we don't want law enforcement saying do something, bitch while they are holding assault rifles at 39th and Kedzie.

It is crazy what's happening.  It is dangerous what's happening.  But it is not Ms. Martinez that's the danger, it is a lot of what is being -- going on in this community.

So after watching this video, which shows nothing what they are saying -- I understand they are relying on what the agents are telling them, but the video does not support what is being said.

When I watched the video after this agent says do something, bitch, I see the driver of this vehicle turn the wheel to the left, which would be consistent with him running into Mrs. Martinez's vehicle, okay. And then seconds later he jumps out and just starts shooting.

My understanding -- I don't have discovery here, but some of those shots went through the front passenger, the vehicle, of Mrs. Martinez's vehicle, which would not be consistent with somebody coming at you head on. Again, we don't have any -- any more discovery on it.

But what I do know is that it was Mrs. Martinez who was hurt, who has seven holes in her body from five shots from this agent who shot within seconds of exiting the vehicle.

So I do think there is a danger to the community, but I do not think it is Mrs. Martinez.

She immediately drives her car, despite being shot multiple times, pulls over at a safe space away from these militarized agents and calls 911 herself and says, hey, I was just shot by ICE. And an ambulance comes and takes her to the hospital.

She gets to the hospital, Judge. Actually, let me back up.

So then on the body camera video of which there is three agents, and only one happens to have their recording on, at the end of this, the agent is asked by somebody else who

responds, hey, what happened?  And the other agent points to
the body camera and says, quote, hey, don't speak, you are
good.

Now why?  Body cameras, as you know, are used by law
enforcement to show realtime situations of what is happening so
we can see what's going on.  And he tells him not to speak.
Well, if she truly swerved at him, as they are alleging, just
say that on the camera.

But to say don't speak because my body camera is on --
the whole point of the body camera is to capture that stuff.
So that's alarming under the nature and circumstances of the
offense.

And I will also note, Judge, that this wasn't a
protest.  Like Mrs. Martinez was not out there looking for
this.  She was actually running errands.  But in this community
they are alarmed when they see these kinds of things going on
because she cares.  As you'll see from the character letters I
have for her, she is an empathetic person.

She herself is a U.S. Citizen.  Other than what's been
stated by the administration about how she appears, she has no
reason to worry about ICE stopping her, right?  She's worried
about other people.  And that's a fair concern that anybody in
the community should have at this time based on what's going
on.

So I would argue that the nature and circumstances of

the offense, if you actually look at the facts -- and maybe if
your Honor wants to see the video, you can watch it -- to me it
shows nothing of what they're saying and in fact would probably
weigh in favor of our version of events here.

The weight of the evidence, your Honor has already
mentioned, that's the least important factor.  Again, I
argue -- I have been watching the video.  To me it shows that
the agent turns to the left, which is where she would be.

The fact that he says do something, bitch right
beforehand is troubling at best.  And also shows that these
people are on edge.  Maybe even encouraging confrontation.  But
I don't have enough information from the government to talk
about the strength of the case right now.

So the most important factor, which your Honor pointed
out the government did not mention, are the history and
characteristics of the person.  Because that's what we're
trying to figure out, can your Honor set conditions that will
assure the community is safe from Mrs. Martinez.  And of
course, your Honor has pretrial's recommendation which says, of
course she should be released.

By way of factual background, she's a 30-year-old U.S.
Citizen.  She has lived in Chicago her entire life.  She
is -- before this has never been arrested before for anything.

She lives at home in a house where she has lived for
over 20 years with her parents and her sister.

1    Judge, I would offer up her parents as a third-party

2  custodian, but I don't even think that's necessary.  That's not

3  a condition that pretrial is recommending.  We'll do it if

4  that's the deciding factor here, but I don't even think that

5  the government's presentation gets us there.

6    She -- your Honor mentioned the importance of

7  employment in the prior case.  She has been fully employed as a

8  teachers's aide for the past three years.  Prior to that she

9  has been working in cosmetology where she has her certificate

10 in.

11   I have with me, and I can pass up to the Court, over

12 30 letters.  And these were just gathered in the last nine

13 hours, not just from colleagues at -- where she works, but from

14 parents who have seen her day in and day out with the children

15 that she works with.  And they have described her as kind,

16 dependable, honest, empathetic -- empathetic, loving, and

17 I -- she built a foundation of love for our child.

18   And I think what probably got her into this mess is

19 that she's always looking out for others.  So I think if

20 anything, that's what we're dealing with.  We're dealing with a

21 person who is looking out for her community.

22   And things went wrong here.  And I think there

23 is -- there is most likely blame everywhere.  But there

24 is -- this is a person who is showing up at work and lives her

25 life day in and day out.  And I have these letters I'll give to

the Court.  I would just ask that they be filed under seal to the extent the Court wants to read them.  But they tell you who she is.

And as your Honor knows, under 3142(g)(3), the first thing that Congress listed -- lists is what's the character of the person.  And this demonstrates what her true character is, not what these out-of-town agents are alleging.

Her employer is here today in the courtroom.  She is in full support of her employee.  She has a job to go back to as soon as she's released and gets treated for the bullet wounds that the -- she's not currently being treated for.  But I think, again, that demonstrates the level of support that she has.

The room is also full of her family and supporters as well.  If your Honor wants, I can have them stand up or we can -- or you can just take note.

She is a high school graduate.  There is no drug or alcohol issues.

We have heard about this gun thing.  And again, this is why the government's presentation, not only in this case but in others, is troubling.  They just throw out there, and it is out there in the media, that she was armed -- like fully armed, right?  She's a FOID, CCL carrier.  She's allowed to have a gun.  In fact, lots of people support U.S. Citizens having the right to bear arms, which she did.

1   There is no allegation in this case from these three

2 agents who apparently could see this whole thing that she ever

3 displayed a gun, waved a gun, touched a gun, possessed a gun.

4 She happened to have a gun in her purse.  That's it.

5   But we put out that sound bite that she's fully armed

6 and everybody is up in arms that, you know, people are

7 attacking these agents with firearms.

8   That is just not the truth.  That's not the facts.

9 They know it.  But they just put out there she was fully armed.

10 There is no evidence that a gun was ever used, possessed, or

11 displayed in this case.  And she's fully licensed.

12   And what it shows is that when she wants something,

13 that she knows how to follow the rules.  She goes and gets the

14 licenses that she needs to possess a firearm, which all U.S.

15 Citizens are allowed to possess.

16   The medical -- the reason -- one of the other reasons

17 she needs to be released, Judge, is she was taken to the

18 hospital by law enforcement.  She was shot.  My understanding

19 is likely five times.  There are seven bullet holes, depending

20 upon entry/exit wounds.

21   But the agents in their haste to get her to the jail

22 because she is so dangerous, pull her out too early, and she

23 starts bleeding again and has to go back to the hospital

24 because it is bleeding through her bandages.  And she

25 can't -- it can't be handled at the MCC.  So that is troubling.

1    She has been told that she needs to change these

2    bandages every six hours.  We're on hour 16 right now, and

3    there has been no change of these things.

4    We want her out today so that she can get her own

5    private proper medical care, go back to work, fight this case

6    so that we can show people what really happened here.

7    And of course, we would argue that there are

8    conditions that this Court can set.  Pretrial has listed some

9    of them.  We are in agreement with all of those conditions.

10    And we ask that you set that.  Let her be released

11    today, hopefully soon, because I have seen issues where they

12    won't let her out until the next day.  But I'm most concerned

13    about her getting to a doctor today so she can be treated for

14    these injuries.

15    THE COURT:  Thank you.

16    Just to confirm, and I saw this in the pretrial

17    services report, but Officer Green, pretrial services's

18    investigation also confirmed that Ms. Martinez has a FOID card

19    and concealed carry license, correct?

20    MS. GREEN:  Your Honor, we were unable to complete the

21    FOID and concealed carry license query.  It was just by the

22    defendant's own report that she has the one firearm and that

23    she does have her CCL.  But we were not able to confirm it.

24    THE COURT:  Okay.

25    MR. PARENTE:  And I'll proffer to the Court that she

does.  But also that the firearm in question is in law
enforcement custody now, and there are no other firearms in the
residence.

THE COURT:  Okay.  And just you -- I believe you just
said this, Mr. Parente, but you're not objecting --
Ms. Martinez is not objecting to any of the proposed
conditions, correct?

MR. PARENTE:  No, your Honor.

THE COURT:  Okay.  Thank you.

Mr. Horwitz.

MR. HORWITZ:  Thank you, Judge.  We're also in
agreement with pretrial's recommendation on release.  We also
have no objection to the conditions proposed by pretrial
services.

I want to just start by one of the last things that
the government said, which was that the dangerousness outweighs
the mitigation in this case.  And I think that's just a
misstatement of the standard that the Court needs to consider.

The presumption is release.  The defense doesn't need
to show anything in order to be entitled to release.  It is
that clear and convincing high standard that the government
needs to show.

And as the Court -- as we discussed and as the Court
is aware, the weight of the evidence, the nature and
circumstances of the offense charged are just considerations

 1  for the Court.  And it is also important to take into account

 2  the individuals sitting before the Court.

 3          Anthony Ruiz is also a U.S. Citizen.  He's also a

 4  lifelong resident of Chicago.

 5          He attended Gage Park High School where he reached the

 6  11th grade.  He currently lives with his mother, father, and

 7  two brothers.  He also has two adult sisters, one in Rockford,

 8  Illinois; one in Wisconsin.  So he's one of five.

 9          He doesn't own a gun.  Has never owned a gun.  Nothing

10  gun related as far as he's concerned.

11          Mr. Ruiz is self-employed as a DJ.  And just to

12  clarify what that means.  He attended Gage High School.  He

13  does school events at the high school.  He does events also at

14  Lurie Park High School.  He does baby showers.  He does Latin

15  disco.  He does birthday parties.  He does weddings.

16          So whatever the Court's vision of what that means, it

17  is private events.  It can be with children.  It can be about

18  pregnancies and births and things of that nature.  So he

19  arranges music for a variety of events and that's how he

20  supports himself.

21          His father works as an auto mechanic, and he has been

22  teaching Anthony in that field as well.  He doesn't have formal

23  training in that area, but he also hopes to learn enough that

24  he can one day work on cars, perhaps in a body shop on his own.

25          Mr. Ruiz's mother works with one of Mr. Ruiz's older

sisters. She handles the administrative side of a business that they work at together. And she works 100 percent out of their home.

I asked her, what percentage of the time do you think you're home? Is it 90 percent? And her other daughter, who is with her in court today joked, it is probably more like 95 percent, mom.

So what you have here is an extremely close-knit family who has lived in Chicago for Mr. Ruiz's entire life. They are not going anywhere. They are staying right here in the community, in the neighborhood that they know.

His mother is going to be around to help him keep track of court dates, court orders, and keep him on the right path.

On the right path is what Anthony Ruiz has been doing his entire life. He has no criminal history. There is no allegation of anything remotely violent or troubling prior to the date of the allegations in this case.

And so if we're weighing what -- the information that the Court has and extrapolating into the future what is the likelihood that there is dangerous conduct in the future, I just don't think that meets the clear and convincing standard that the government needs to show that Mr. Ruiz will pose a danger in the future.

Somebody that's never been arrested before, it lands

1    pretty heavy, I think, to have spent the weekend in federal

2    custody facing a number of years that he probably did not

3    fathom would ever be announced in a courtroom attached to his

4    name.  And the gravity of this case against him is not lost on

5    him.  And so the idea that he would go out after being released

6    here and then engage in dangerous conduct, that's just not

7    supported by the record.

8            Considering the history and characteristics of

9    Mr. Ruiz, the government's evidence falls short.  We look

10   forward to the government producing discovery in this case.  As

11   the Court has announced multiple times today already, the

12   presumption of innocence is not affected by anything the

13   government says here today or any of the proffers made by the

14   government here today.  And we look forward to preparing the

15   case and investigating the case and seeing what actually

16   happened on the date that the government is making these

17   allegations from.

18           So without belaboring the point, Anthony Ruiz is

19   somebody that the Court can feel comfortable releasing back

20   into the community.  He has a strong family support system who

21   joins him in court today, who has been very communicative with

22   me over the phone over the weekend.

23           I'm not sure what the lapse in communication was with

24   pretrial services.  But they are here to corroborate any of the

25   factual information that Mr. Ruiz provided during his interview

first thing this morning.

And Mr. Ruiz is somebody that this Court should feel confident will obey all court orders and not be anywhere remotely close to any kind of danger during the pendency of this case.

THE COURT:  Thank you, Mr. Horwitz.

Mr. Hennessy, anything you want to say in reply?

MR. HENNESSY:  Thank you, your Honor.  Just a couple of factual things.  It is pretty clear that Mr. Parente and the government are not going to agree on what the BWC shows.  But if we're going to talk about quotes from the BWC, moments before the collisions you can clearly hear the agents in the car say, we're getting boxed in, we got to get out of here.

And just before the strike on the left side, the driver's side of the CBP vehicle, one of the agents in the car says, she is going to make contact.  And I suspect the "she" means Ms. Martinez.

That happens right before the BWC also captures a collision on the left, which results in the car shifting to the right and then a collision on the right which results in the car shifting to the left.  So I just wanted to clear that up.

And the last thing on the -- on the introduction of the firearm, the government did not argue that Ms. Martinez was fully armed.  What the parties agree on is that a loaded firearm was found in Ms. Martinez's vehicle, the one that she

1  was driving during the sequence of events.  Introduction of a

2  firearm into a situation like this is dangerous.

3          That's all I have, your Honor.

4          THE COURT:  But she never, just to be clear, and I

5  asked you this earlier, there is no allegation here that she

6  brandished this firearm.  It was in -- it was out of sight of

7  these agents that entire time, correct?

8          MR. HENNESSY:  Correct.

9          THE COURT:  And it was the agent who had a firearm and

10 actually used it, correct?

11         MR. HENNESSY:  Yes, your Honor.

12         THE COURT:  Thank you, Mr. Hennessy.  Is there

13 anything further?

14         MR. HENNESSY:  No, your Honor.

15         THE COURT:  Thank you.

16         Officer Green, is there anything further?

17         MS. GREEN:  No, your Honor.

18         THE COURT:  We're here on the government's motion to

19 detain defendants Miramar Martinez and Anthony Ruiz.  And the

20 government sought a detention hearing, and the Court found that

21 the government was entitled to a detention hearing pursuant to

22 18, United States Code, Section 3142(f)(1)(A) because this does

23 con- -- the violation here in the criminal complaint does

24 constitute a crime of violence.

25         The government here seeks to detain only on a danger

to the community.  And as a result, I'm going to limit the
Court's comments, analysis, findings just to that prong of the
Bail Reform Act because a risk of nonappearance is not alleged
in the government's motion or not argued in the government's
motion.

Pretrial services recommends release with respect to
both of these defendants on conditions that they have proposed
in an email correspondence.

And I also, again, just want to put on the record, I'm
very grateful to pretrial services for their very quick
analysis today with respect to gathering these facts and making
such an informed and thoughtful recommendation here.

The Court, having reviewed and considered the evidence
presented to include pretrial services's analysis in those two
emails, as well as their recommendation of release, and having
heard argument from the parties on both sides here, the Court
makes the following findings of fact and conclusions of law:

So both defendants are changed in a single complaint
with violating 18, United States Code, Section 111(a) and (b)
and that they forced their -- they are alleged to have forcibly
assaulted, resisted, opposed, impeded, intimidated, and
interfered with a person designated in Title 18, United States
Code, Section 1114, namely an officer and employee of the
United States while he was engaged in the performance of his
official duties and in the commission of such acts used a

deadly and dangerous weapon.

In considering the government's motion for detention, I am guided by the Bail Reform Act and also guided by several important principles.

At all times these defendants are entitled to the presumption of innocence. Nothing that the Court sets forth in its findings is intended or should be considered to affect that presumption.

The purpose of this hearing is to determine, notwithstanding that presumption of innocence, the defendants should be detained or released pending trial. Under the Bail Reform Act, a defendant must be released prior to trial unless the Court finds that no conditions or combination of conditions exist that will reasonably assure the safety of any other person in the community.

The Act requires the least restrictive conditions be imposed that are necessary to provide this reasonable assurance. If the Court cannot find any conditions that will reasonably assure the safety of the community, then the Court is required by the Act to order a defendant held in custody.

With respect to the burden of proof, the facts supporting a finding that no condition or combination of conditions will reasonably assure the safety of any other person in the community shall be supported by clear and convincing evidence.

1    I turn now to the 3142(g) factors that the Bail Reform

2  Act require the Court to consider.  And they are as follows:

3  The nature and circumstances of the alleged offense, the weight

4  of the evidence against these defendants.  Although as I have

5  already noted during argument, this is the factor under Seventh

6  Circuit case law that carries the least weight.

7        The history and characteristics of the defendant,

8  which include defendant's physical and mental condition, family

9  ties, employment, length of residency in the community,

10  criminal record or lack thereof, history of drug or alcohol

11  abuse, record of appearance at prior court proceedings, whether

12  the defendant was on a conditioned release of some sort at the

13  time of the new alleged offense and then, finally, the fourth

14  factor is the nature and seriousness of the danger to any

15  person or the community.

16        The Court has considered the evidence presented on

17  factors during the hearing today by both sides, and I

18  have -- the Court's also considered the release recommendation

19  by pretrial services as to both of these defendants.

20        And based on the specific facts in this case and

21  specific consideration of each of these defendants, the Court

22  finds that the government has not met its burden here and that

23  the evidence presented before this Court does not establish

24  through clear and convincing evidence that there are no

25  conditions or combination of conditions that could reasonably

secure or mitigate any risk to the community.

Let me put my analysis on the record. So I -- this is obviously a serious offense. The Court acknowledges what the government emphasized here that with respect to what's alleged, that Mr. Ruiz's involvement with respect to this group of cars chasing or following the caravan, that Mr. Ruiz was involved for approximately 20 minutes, Ms. Martinez for approximately 30 minutes.

These are law enforcement officers tasked with doing their job. The fact that this was a caravan, the fact that these defendants are alleged to have been involved in chasing this caravan, I mean, it is a serious offense. And that factor alone would support detention.

The weight of the evidence here. This is a case that has been charged by a criminal complaint. The only probable cause finding has been made by the Court by way of that criminal complaint. And this is the least important or least weighty factor under Seventh Circuit analysis.

It dovetails with the nature and circumstances of the offense. And both of those would support detention here, again given how serious the allegations are here.

It is the history and characteristics of these defendants, it is the lack of any criminal history here, and -- and it is those factors that are driving the Court's decision here to release and in finding that the government has

not met its burden.

And the proposed conditions of release that pretrial services has recommended, and to which the defendants do not object, are the conditions of release which the Court intends to impose.  They are adequate.  The supervision that pretrial services will provide, as well as no firearms, no possessing, you know, unlawful drugs.  Again, these are people with no criminal history.  This is not a situation where I have got people in front of me who have a demonstrated history through their criminal history of breaking the law or not following Court-imposed conditions.

In addition, again, under the 3142(g) factors, which the Court must consider all of them, these are two defendants who have community ties, immense family and community support, as demonstrated here in this courtroom physically, but then also based on what had been proffered by the defense with respect to letters of support, et cetera.  I mean, that kind of family support sets up a defendant on bond for success.

These are also defendants who are employed.  I -- in this duty courtroom, it is extraordinarily rare to have a defendant in front of me who has such immense family support and also has employment.  Again, those go to stability.

The -- with respect to the family support, the fact that these two defendants will continue to reside in their homes with their parents, all of this is -- all of these

conditions combined are going to be in this Court's estimation
sufficient to mitigate any risk of danger to the community
here.

The last factor here, which is the nature and
seriousness of the danger to any person in the community.  This
circles back then to the nature and circumstances of the
alleged offense.  That is all that the government can point to
here.  That's it.  And they are just allegations, and this
Court is applying a presumption of innocence.

This is a horrible situation, right?  It is a miracle
to me that no one was more seriously injured.  And this is not
to minimize that Ms. Martinez, who is sitting here today, was
shot multiple times.  But that no bystander, no other law
enforcement, that no one else was hurt here is a miracle.  This
whole situation was dangerous.

But that is the only factor that this Court finds that
could weigh in favor.  The seriousness of the offense, the
nature and circumstances of the offense are the only factors
that the Court finds could support detention.  All of these
other factors support release here.

Further, the conditions that pretrial services intends
to impose are sufficient.  They will mitigate the risk -- in
this Court's estimation the risk of danger to the community.

I need the paperwork finalized.  I need everyone to
sign it.  I then need to admonish the defendants.

1          We are at 3:00 o'clock right now.  And I am very

2   much -- particularly because of Ms. Martinez's health

3   situation, I would like to get this paperwork done as quickly

4   as possible.  And I'm wondering if we can sign the paperwork,

5   give it to the marshal service to process, and then I'll

6   admonish.  So can we quickly do this?

7          I have a 3:00 o'clock detention hearing in another

8   courtroom.  I'm going ask them to wait momentarily so that we

9   can get this done as efficiently as possible.

10         We're off the record.

11      (Recess at 2:59 A.M.)

12                           CERTIFICATE

13         I certify that the foregoing is a correct transcript

14  from the digital recording of proceedings in the above-entitled

15  matter to the best of my ability, given the limitation of using

16  a digital-recording system.

17

18

19  */s/Pamela S. Warren*                    October 7, 2025
    Official Court Reporter - Retired             Date
20  United States District Court
    Northern District of Illinois
21  Eastern Division

22

23

24

25